Filed 11/22/22  P. v. Houseman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093921 |
| Plaintiff and Respondent, | (Super. Ct. No. 79293) |
| v. | |
| RANDALL HOUSEMAN, | |
| Defendant and Appellant. | |

Over 30 years ago, defendant Randall Houseman was convicted of two counts of murder after his accomplice killed two people during a burglary.  The prosecution's theory of murder was based on the former felony-murder rule, which provided that all participants in a burglary (and certain other crimes) are guilty of murder when one of them kills while acting in furtherance of the crime.  That theory, although a valid theory at the time, is valid no more.  Effective January 1, 2019, the California Legislature narrowed the felony-murder rule "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."

1

(Stats. 2018, ch. 1015, § 1, subd. (f).) It also, with the addition of Penal Code[1] section 1172.6 (former § 1170.95),[2] established a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief.

In this appeal, defendant challenges the trial court's denial of his petition to vacate his murder convictions under section 1172.6. The trial court found defendant ineligible for relief because, after reviewing the evidence produced at trial, it found the evidence showed that defendant remained liable for the murders under two still-valid theories of murder. First, it found he remained liable for the murders because the evidence showed he was a major participant in the crime and acted with reckless indifference to human life. Second, it found he remained liable for the murders because the evidence showed he aided and abetted his accomplice with the intent to kill. Challenging the trial court's findings, defendant asks us to independently evaluate whether his murder convictions should be set aside under section 1172.6. He further asks us to correct two alleged factual misstatements in his probation report. We affirm.

Because defendant's challenge to the trial court's findings raises predominantly factual questions—including, for instance, whether defendant was a major participant in the crime and acted with reckless indifference to human life—we review these findings for substantial evidence. Applying that deferential standard here, rather than defendant's preferred independent standard of review, we find the evidence sufficient to support the trial court's findings that defendant was a major participant in the crime and acted with reckless indifference to human life. Because that is enough to sustain defendant's murder convictions, we need not address the trial court's additional ground for finding defendant guilty of murder. We also will not address defendant's final claim concerning the alleged

---

[1] All further statutory references are to the Penal Code.

[2] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

factual misstatements in his probation report, which is a matter outside the scope of this appeal.

BACKGROUND

A.    *The Murders of Donna and Katherine Roberts*

The Roberts family—consisting of father Lawrence, mother Katherine, and daughters Donna and Michelle—lived in Sacramento in the summer of 1986. One of Donna's best friends, Rebecca Palanuk, stayed with them for three weeks in July and August of that summer. During that summer, Palanuk briefly dated Gary Hines.

At some point during the summer, Katherine learned of Hines's criminal record and told him "not to come around." Notwithstanding Katherine's request, Hines continued to visit Palanuk at the Robertses' house on two to three occasions and, during one of these visits, Donna told him about her father's roadster, a pink fiberglass replica of a 1923 Ford Model-T roadster. On seeing the car, Hines told Palanuk, "I am going to get [that car] one way or another." Hines afterward "rambl[ed]" to others about the roadster, claimed it was his, and said he had to collect it from "some friends."

Defendant met Hines during this summer at a time when he was living "off and on" with Steven Tabor. On September 14, 1986, both defendant and Hines spent the night at Tabor's house. Jaime Pyle, who was then in a "love relationship" with Hines, saw Hines that evening playing with a white-handled pistol in Tabor's living room. Although defendant could have been present at the time, Pyle could not "say for sure." The following morning, around 8:30 a.m., a woman who defendant was dating, Cindy Wilson, drove defendant, Hines, Tabor, and Pyle to an area in south Sacramento at Hines's direction. Hines and defendant got out two to three blocks from the Robertses' house and the others drove off. Hines and defendant then walked to the Robertses' house.

Donna was home at the time and, around 10:00 a.m., she called a friend. According to the friend, Donna sounded "kind of scared a little bit," though when asked,

3

she denied that anything was wrong. The friend heard at least two male voices in the background and, when the friend asked who was present, Donna mentioned "Gary," the "one that [Palanuk] was going out with." Shortly after, the friend said, a man told Donna to "hurry up and get off the phone." Donna then hung up.

A little over an hour later, a person walking home saw a man trying to pry the lock off the Robertses' garage door with a crowbar. Around the same time, another person saw a man get into the Robertses' car in the driveway and roll it down the driveway. The man then got out of the car and walked back toward the house. Also around this time, a third person saw a man getting out of the Robertses' car that had been parked in the driveway and another man standing in the front doorway smoking a cigarette. The garage door was open at the time and a roadster was parked inside.

Multiple witnesses afterward saw two males driving the Robertses' pink roadster through Sacramento. According to one witness, the driver was "roaring up the engine" and the passenger was viewing himself in the mirror and fixing his hair. According to another witness, the guys in the car were waving at the girls on the street and "having a good time." And according to a third witness, the passenger waved at her daughters, who were 14 and 17, and "sort of stood up in the seat" and "wav[ed] real happy." Several witnesses testified that the men were in their late teens or 20's. Defendant was 16 years old at the time; Hines's age, as best we can tell, is unclear from the record, though our Supreme Court has said he was 20 at the time. (*People v. Hines* (1997) 15 Cal.4th 997, 1016 (*Hines*).) Several others identified defendant as the car's passenger.

Sometime after the ride in the roadster, Tabor's neighbor saw Hines and defendant polishing the roadster. Defendant exclaimed, "Look at what we got." Hines and defendant eventually drove the roadster to Wilson's sister's house and they, along with Pyle, stayed there overnight.

Around the time Hines and defendant were riding around town in the roadster, officers found the lifeless bodies of Donna, who was 15, and Katherine. Both had been

4

shot multiple times. Donna had been shot four times—in her right eye, her left thigh, her neck, and the middle of her back. Donna had also been blindfolded, her mouth gagged with a cloth, her wrists bound with a shoestring, and her ankles bound with a telephone cord. Katherine, in turn, had been shot four times—in the head, in her left wrist, and twice in the torso. Katherine had also suffered several head abrasions and lacerations consistent with being struck with a blunt object; a broken jaw likely caused by blunt force; several stab wounds to her neck, possibly inflicted by scissors; injuries to her neck consistent with having been "grabbed . . . around the neck"; several bruises; a stab wound to her left hand; and multiple injuries to her right hand that appeared to be defensive wounds, including a stab wound, several lacerations, and broken fingers.

Apart from finding the two murdered women, the officers further found an empty gun cabinet in the master bedroom, a padlock on the outside of the gun cabinet that had been forced open, a pair of damaged scissors in front of the gun cabinet, and a "locking device on the garage [that] appeared to have been pried."

### B.      *Defendant's Arrest and Testimony*

The morning after the murders, officers drove to Wilson's sister's home after receiving a tip about the roadster's location. The officers found defendant talking to two people in a truck when they arrived. They tried to detain the truck when it left but the driver, Wilson, took off at high speed. Shortly after, however, Wilson crashed and was arrested. In the truck, officers found five rifles and shotguns that had been stolen from the Robertses' home wrapped in a blanket. Pyle later testified that before the officers arrived, she saw six or eight rifles and shotguns laid out on a blanket on the floor in Wilson's sister's home; but at some point, defendant told her the guns would be moved and then later told her Wilson and another person had taken the guns. The officers also found the Robertses' roadster parked behind the house, partially covered with blankets and tarps. A detective noticed that someone had tampered with the roadster's ignition

5

and hot-wired the car. He also found that the car's license plates had been removed and placed under a cushion in the car.

Shortly after arresting Wilson, officers found both Hines and defendant in the home. The officers found Hines sitting in a chair in the living room beside a woman's bag. The bag contained, among other things, the ignition switch from the roadster, a pocketknife, and a loaded revolver with a white handle. The officers found defendant sitting nearby on a couch and, beneath the cushion where he sat, they found a loaded handgun. On a nearby table, the officers found two notes of paper describing the guns taken from the Robertses' house and, next to each gun, a dollar amount—for instance, "410 shotgun," "$40." The officers arrested Hines, but not defendant, at this time.[3]

Two experts later opined on several matters that tied Hines and defendant to the Robertses' home, guns, and roadster. A handwriting expert testified that he believed defendant wrote one of the two notes describing the guns taken from the Robertses' home. A fingerprint expert testified he found fingerprints matching Hines's fingerprints at the Robertses' home, on the roadster, on the note paper listing the guns, and on several items found in the woman's bag that had been next to Hines. He further testified that he found fingerprints matching defendant's fingerprints at the Robertses' home, on the roadster, on the roadster's license plate, on the note paper listing the guns, and on several items found in the woman's bag.

Following Hines's arrest, two detectives questioned defendant about his activities the day of the murders. Defendant said he did yard work during the day, hung out with a friend afterward, and then went to Wilson's sister's house at night. He also claimed he

---

[3] At Hines's trial, one witness (a criminalist) testified that he saw blood on Hines's pants and shoes and "blood on the shirt [defendant] was wearing when he was arrested." (*Hines, supra*, 15 Cal.4th at p. 1018.) Although this same witness also testified in defendant's trial, he never discussed these matters in his testimony. Nor, as far as we can tell, did any other witness.

knew nothing of any guns being at the house while he was there, said he only knew Hines for about a week, and said Hines was "act[ing] like he had something on his mind" before the officers arrived. After a detective advised him that he had reason to believe defendant knew more about "the homicide we're investigating," defendant maintained he knew nothing, denied being with Hines the day before, and denied seeing the roadster.

After a detective told defendant that he was under arrest for double murder and that Hines had placed the blame on him, defendant changed his story. He said Hines "just asked me if I could run over to his place with him," which resulted in them going to the Robertses' house. According to defendant, because he had not met Donna before, he "cut a rose off the stem" and gave it to her when Hines introduced them. He then entered the house with Hines and Donna. Defendant said Hines acted like Donna was his girlfriend and, at some point, Hines and Donna were laughing about Hines jumping on top of her and tying her up. Hines asked for defendant's help in binding Donna but, instead of helping, he went in the garage to look at the roadster. Hines then started shooting Donna. Until that time, defendant claimed, he had not known Hines was carrying a gun. After seeing Donna shot on the floor, defendant ran toward the front door just as Katherine was coming in. Defendant then sought a different exit and, as he ran, Hines "started shooting her." Defendant eventually left the home through the front door and, after Hines started the roadster, he joined Hines in the car.

After further questioning, defendant again changed his story. He said that he had known Hines for about a month, not just a week; that Hines asked him to join him for "protection" and "back-up" after getting "burnt" on a "transaction," not to "run over to his place"; and that he knew Hines had a gun shortly before he started firing, not just afterward. Defendant added that he watched Hines tie up Donna "[a]nd all this time, I ke[pt] thinking, 'Wait a minute, you know. He's going to fuckin' probably try to shoot her.' " He further said Hines had threatened Donna, saying, "I could shoot you right now," and Donna responded, "Don't threaten unless you're going to do it." When a

detective asked how Hines held the gun and bound Donna at the same time, defendant responded, "[H]e was here, in front of her with the gun. She was already in a fuckin['] thing, like this, you know, and all he had to do was put her stomach, or whatever, against her knees, and she was just stuck in that kind of position." When a detective further asked what he did after Hines tied up Donna, defendant said he told Hines, "[Y]ou better think."

Defendant later testified about these same events. He said he met Hines less than a week before the murders and, the day before the murders, Hines asked if he "would go with him to pick up this money this guy owed him." Hines said they would then return to Tabor's house, buy some drugs, and "party" with the money they obtained. Defendant agreed to join, believing Hines only wanted him to join for moral support. The following morning, Wilson drove Hines and defendant to meet "the guy" to collect the money. After she dropped them off, Wilson drove off and Hines knocked on the door of a house.

Donna, defendant went on, answered the door and let them in. Defendant, "to introduce [him]self to her," picked a rose for her and told her his name. After some time in the home, Hines told defendant he was going to tie up Donna. After defendant told him not to, Hines added that he was going to shoot her too. Defendant did not ask Hines for his reasons and, at some point, went to look at the Robertses' roadster, which was parked in the garage. When defendant returned to the house, Hines was showing Donna his gun—the one with the white handle. Hines asked Donna if he could shoot it in the house, but she said no, and defendant then asked Hines to put the gun away because it was scaring Donna and making him nervous. Hines complied with the request. Hines again told defendant he was going to tie up Donna, and defendant again told him not to. Defendant also asked Hines for an explanation at this time, but Hines offered none.

Sometime after, according to defendant, he saw Hines on the couch with Donna, attempting to tie her up. Both Hines and Donna were laughing at the time. Defendant told Hines to "think" and to untie her. Defendant then returned to the garage, and Hines

8

told him to "[g]et what they got." But defendant said, "No, I don't want no part of it." Moments later, while standing in the doorway leading from the kitchen to the garage, defendant heard several gunshots and saw Hines firing one shot at Donna. Seeing no exit from the garage, defendant entered the house and sought to leave through the front door. But on seeing Katherine entering the home, he sought another exit. Defendant heard several shots as he ran. Not knowing what to do next or where to go, defendant decided to remain at the house. After Hines pulled out from the garage in the roadster, Hines called defendant and told him to get in. Defendant, although fearful of Hines, joined him in the car.

After getting into the roadster, defendant continued, he saw the Robertses' guns for the first time wrapped in a blanket. Although he acknowledged he afterward moved the guns to Wilson's truck, he said he only did so because Wilson's sister wanted them out of her house. And although he acknowledged the handwriting on one of the scraps of paper that listed the Robertses' guns could have been his, he did not remember writing the list. He denied removing the license plates from the roadster, though he said he could have handled them after they were removed. He also denied putting the handgun under the couch cushion on which he sat when the officers found him. In his telling, he had been sitting on the couch for less than 30 seconds when the officers arrived.

C.      *Defendant's Conviction and Petition for Resentencing*

Following the murders, defendant was charged with two counts of first degree murder (§ 187, subd. (a)) and one count each of burglary (§ 459), robbery (§ 211), and auto theft (former § 487.3). As an enhancement for each count, the charging document also alleged that a principal was armed with a firearm. (§ 12022, subd. (a).) The jury found defendant guilty on all counts and found true the firearm allegation. The trial court afterward sentenced defendant to 25 years to life for each murder count, plus additional time for the associated armed enhancements. The court stayed the sentences on the remaining counts under section 654. Our court affirmed on appeal.

9

Over 30 years after sentencing, in 2019, defendant petitioned the trial court to have his murder convictions vacated under section 1172.6. Section 1172.6 (formerly § 1170.95) was part of a bill that " 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 959.) The bill amended several statutes defining murder (namely, §§ 188 & 189) and, more relevant here, added former section 1170.95 to "provide[] a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis*, at p. 959.)

Under the procedure established in section 1172.6, if a petitioner makes a prima facie showing for entitlement to relief, the trial court must issue an order to show cause and then hold a hearing "to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subds. (c), (d)(1).) The statute adds that, at the hearing stage, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

After defendant filed his petition for resentencing under this statute, the trial court issued an order to show cause and then held a hearing. After hearing the parties' arguments and reviewing the trial record, the court denied defendant's petition in a 123-page written opinion. It acknowledged that the jury must have found defendant guilty under the former felony-murder rule, a no longer valid theory of murder; but after reviewing the record, it found the evidence established his guilt under a still-valid theory

10

or murder for two independent reasons. First, it found beyond a reasonable doubt that defendant was a major participant in the crime who acted with reckless indifference to human life. Second, it found beyond a reasonable doubt that defendant "actually directly aided and abetted both murders, and acted with intent to kill with regard to each murder." In the course of reaching these findings, the court noted defendant's "consistent evasiveness" and changing story, found critical parts of his trial testimony not credible, and, in the end, among other things, concluded "beyond a reasonable doubt that the defendant actually assisted in tying up Donna before she was shot," that he "stabbed Katherine after Hines shot her," and that he "choked and assisted beating [Katherine] with a blunt instrument."

Defendant timely appealed.

DISCUSSION

A.    *Standard of Review*

We start with the standard of review for reviewing the trial court's findings. According to defendant, we should independently evaluate the evidence to determine whether defendant is ineligible for resentencing. He reasons that "a reviewing court is equally capable of resolving factual disputes presented in a 'cold record' and the issues under review present predominantly legal questions." According to the Attorney General, however, we should instead consider whether substantial evidence supports the trial court's decision.

We agree with the Attorney General. The questions raised here are predominantly factual—namely, whether defendant was a major participant in the crime and acted with reckless indifference to human life. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 302 ["the question whether [the defendant] acted with reckless indifference to human life is predominantly a factual determination"].)  And when an appellate court is tasked with reviewing "mixed questions of fact and law" that are "predominantly factual," it evaluates only for substantial evidence. (*People v. Gamache* (2010) 48 Cal.4th 347, 385

11

["To the extent mixed questions of fact and law are present, they are reviewed de novo if predominantly legal and for substantial evidence if predominantly factual"].)

That is true even when, as in this case, the trial court's findings are based on a paper record rather than on live testimony. Our Supreme Court's decision in *People v. Perez* (2018) 4 Cal.5th 1055 (*Perez*) is instructive on this point. The court there considered whether a defendant was eligible for resentencing following an amendment to the Three Strikes law that both narrowed the class of third strike felonies that triggered the law's sentencing enhancements and allowed inmates sentenced under the original Three Strikes law to seek resentencing consistent with the amended law. (*Perez*, at pp. 1061-1062.) Under that resentencing scheme, similar to the law here, "once an inmate has made an initial showing of eligibility for resentencing, the burden is on the prosecution to prove beyond a reasonable doubt that one of the grounds for ineligibility applies." (*Id.* at p. 1062; see also § 1172.6, subd. (d)(3).) Also under that resentencing scheme, similar to the law here, when evaluating whether the prosecution has made this showing, the court may consider, among other things, evidence previously admitted at trial. (§ 1170.126, subd. (g) [broadly allowing courts to consider relevant evidence]; see also § 1172.6, subd. (d)(3) [allowing courts to consider, among other things, "evidence previously admitted at any prior hearing or trial that is admissible under current law"].)

Attempting to meet its burden in *Perez*, the prosecution contended the defendant was statutorily ineligible for resentencing because the evidence produced at trial for his third strike offense showed he had been armed with a deadly weapon—and under the Three Strikes law, even as amended, that fact triggers the law's sentencing enhancements. (*Perez, supra*, 4 Cal.5th at p. 1061; see *id.* at pp. 1065-1066; see also § 1170.12, subd. (c)(2)(C)(iii).) But the trial court disagreed after considering the record from the defendant's earlier trial. (*Perez*, at p. 1061; see also *id.* at p. 1065.) Although, on review, the Supreme Court acknowledged that the trial court's eligibility determination was based only on the record of conviction, and although it further

12

acknowledged that a reviewing court has no "advantage" over the trial court "in determining eligibility based on the record of conviction," it still found the trial court's finding should be reviewed only for substantial evidence. (*Id.* at p. 1066.) It reasoned that "the question whether a defendant was armed with a deadly weapon during his or her current offense remains a question of fact, and we see no reason to withhold the deference generally afforded to such factual findings." (*Ibid.*)

We find similarly here. Because the questions of whether a defendant served as a major participant in a crime and acted with reckless indifference to human life are predominantly factual questions—and indeed, are questions traditionally submitted to a jury—we similarly see no reason to withhold the deference generally afforded to such findings. (See *People v. Gamache, supra*, 48 Cal.4th at p. 385 [mixed questions of law and fact with predominantly factual questions are reviewed for substantial evidence]; *People v. Banks* (2015) 61 Cal.4th 788, 804-811 (*Banks*) [reviewing for substantial evidence a jury's findings that a defendant was a major participant who acted with reckless indifference to human life].) Our decision in this respect accords with all other Courts of Appeal to have considered this issue to date. (See, e.g., *People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090 [courts review trial court's finding for substantial evidence]; *People v. Clements, supra*, 75 Cal.App.5th at p. 298 [same]; *People v. Garrison* (2021) 73 Cal.App.5th 735, 747 ["We review the trial court's determination at the section 1170.95, subdivision (d)(3) hearing for substantial evidence"].)

Defendant nonetheless maintains that "[t]he issue presented on review of a . . . hearing based on a cold record is a 'predominantly legal' question since the real issue for the reviewing court to decide is whether a determination based on facts gleaned from that record satisfies the changed legal standard of culpability now required to justify continuing to punish a petitioner for murder instead of a lesser crime." But on that logic, *Perez* was wrongly decided. In that case, again, after reviewing a paper record, a trial court concluded that a defendant was eligible for resentencing following an amendment

to the Three Strikes law that changed the legal standard for enhanced sentencing. There too, then, under defendant's reasoning, the "real issue" on review was whether the evidence satisfied "the changed legal standard," which "is a 'predominantly legal' question." But our Supreme Court necessarily rejected this type of logic when it found the reviewing court must only review the trial court's decision for substantial evidence. (*Perez, supra*, 4 Cal.5th at p. 1066.) Again, we find this conclusion favors a similar conclusion here.

Defendant also cites various cases from different legal contexts that he contends support his position, including several concerning a trial judge's excusal of a juror (including *People v. McKinnon* (2011) 52 Cal.4th 610, 647), several others concerning a decision to deny parole (including *In re Rosenkrantz* (2002) 29 Cal.4th 616, 625), and several more concerning a claim of ineffective assistance of counsel (including *In re Cudjo* (1999) 20 Cal.4th 673, 688). But none of these cases suggested that the standard of review should vary depending on whether the trial court heard live testimony. A decision to deny parole to a defendant, for instance, is reviewed only for " 'some evidence' " even when the court has considered live testimony. (See *In re Shaputis* (2011) 53 Cal.4th 192, 209 [stating the relevant standard of review without qualification].) A trial court's decision to excuse a juror, in turn, is reviewed under the " ' "demonstrable reality" ' " test even when the court has considered live testimony. (*People v. Peterson* (2020) 10 Cal.5th 409, 472.) And a trial court's resolution of a claim of ineffective assistance of counsel is typically subject to the independent standard of review even when the court has considered live testimony. (*In re Resendiz* (2001) 25 Cal.4th 230, 248 (lead opn. of Werdegar, J.) [noting that these matters generally raise " 'predominantly questions of law' "], abrogated on other grounds by *Padilla v. Kentucky* (2010) 559 U.S. 356; see *In re Resendiz*, at p. 255 (conc. & dis. opn. of Mosk, J.).)

Lastly, defendant contends we should follow *People v. Vivar* (2021) 11 Cal.5th 510, not *Perez*, and subject the trial court's decision to de novo review. But we find

14

*Vivar* readily distinguishable. That case involved an issue—whether "a prejudicial error . . . affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea"—that our Supreme Court found "analogous" to its past immigration cases raising "predominantly questions of law." (*Id.* at pp. 517, 524, italics omitted.) After considering this detail, along with "multiple factors with special relevance [t]here," the court "embrace[d] . . . independent review in th[at] context." (*Id.* at p. 527.) But unlike the court in *Vivar*, we are tasked with resolving predominantly factual questions. Consistent with *Perez* and the rule that mixed questions of law and fact that are predominantly factual are reviewed for substantial evidence, we will review the trial court's findings for substantial evidence.

### B. Defendant's Murder Convictions

Having established the appropriate standard of review, we now consider whether substantial evidence supports the trial court's findings that defendant was a major participant in the crime who acted with reckless indifference to human life.

In addressing these types of issues, courts have "described the range of felony-murder participants as a spectrum. At one extreme [is] 'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.] At the other extreme [a]re actual killers and those who attempted or intended to kill." (*Banks, supra*, 61 Cal.4th at p. 800.) In the former example involving the minor actor, a jury could not find the defendant was a major participant in the crime. Nor could it find the defendant acted with reckless indifference to human life. But in the latter scenario involving "those who attempted or intended to kill," a jury could readily find both elements satisfied. (*Ibid.*)

Defendant's culpability lies somewhere between these two extremes. In evaluating his level of culpability, we focus on both his conduct and his mental state. To determine whether his conduct was sufficient to support the jury's verdict, we consider whether he was a major participant in the crime. And to determine whether his mental

15

state was sufficient to support the jury's verdict, we consider whether he acted with reckless indifference to human life.  (See *Banks, supra*, 61 Cal.4th at p. 798.)

      1.      Major Participant

We consider first whether defendant was a major participant in the crime.

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 611 (*Clark*).)  In answering that question, we consider the totality of the circumstances.  Relevant considerations include:  " 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?' " (*Ibid.*)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks, supra*, 61 Cal.4th at p. 803.)

Considering these several factors and viewing the record in the light most favorable to the trial court's decision, as we must when reviewing a challenge to the sufficiency of the evidence, we find substantial evidence supports the trial court's finding that defendant was a major participant in the crime.  (See *Banks, supra*, 61 Cal.4th at p. 804 ["When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" ' "].)

We start with the two factors that favor defendant.  First, nothing in the record shows that defendant played a role in planning the events that led to the two deaths.

Nothing in the record suggests, for example, that he planned the time, place, or manner of the crime. Second, also favoring defendant, nothing in the record shows that defendant played a role in supplying weapons. Although Hines was armed with a gun, nothing in the record suggests that defendant supplied this gun. Nor does anything in the record show that defendant arrived at the Robertses' home with any weapon of his own. Both these factors, then, favor defendant.

But the remaining considerations cut against defendant. First, the evidence supports a finding that defendant understood the particular dangers posed by the crime. Several facts are relevant to this topic. To start, in his statement to officers following the murders, defendant claimed he joined Hines because Hines wanted "protection" and "back-up . . . just in case something happens"—evidencing an anticipation of some danger. Second, although defendant disclaimed any knowledge of the criminal nature of Hines's plan, his shifting explanations suggest otherwise. At first, he denied being with Hines on the day of the murders. Later, after acknowledging he joined Hines, he claimed Hines "just asked me if I could run over to his place with him." And later still, he claimed Hines asked him to join him for "protection" and "back-up" after getting "burnt" on a "transaction." Considering defendant's shifting explanations, the trial court "could infer that he was lying to conceal his guilt." (*People v. Thomas* (1992) 2 Cal.4th 489, 515.) Lastly, as we will cover more below, Hines informed defendant that he planned to shoot Donna shortly after they entered the Robertses' home. Taken together, this evidence tends to show that defendant understood the particular dangers posed by the crime.

Second, the evidence shows defendant was present at the scene of the murders and in a position to prevent both murders. As our Supreme Court has explained, " '[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits

17

behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' " (*In re Scoggins* (2020) 9 Cal.5th 667, 678 (*Scoggins*).)

In this case, defendant was present during the entire sequence of events leading up to the murders. He entered the home shortly after defendant. He heard Hines say he planned to tie up Donna and then shoot her. He heard Hines tell Donna, after tying her up, "I could shoot you right now." And he afterward told officers, "[A]ll this time, I ke[pt] thinking, 'Wait a minute, you know. He's going to fuckin' probably try to shoot her.' " Early on in the crime, then, defendant understood the potential for murder. Yet he remained at the house until after both Donna and Katherine had been murdered, offering no assistance to either.

More than being simply present, moreover, according to the trial court's findings, defendant affirmatively assisted Hines in binding Donna. Substantial evidence supports this finding. The record shows that Donna had been blindfolded, her mouth gagged with cloth, her wrists bound behind her back with a shoelace, and her ankles bound with a phone cord. It shows no evidence that Donna had any defensive wounds, suggesting she either acquiesced to the binding or was overpowered with little or no struggle. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1283 ["absence of injuries" are relevant to establish that the defendant could and did overpower the victim with "little struggle"].)[4]

---

[4] In defendant's telling, "the lack of any description of defensive wounds in the pathologist's testimony does not constitute evidence Donna either did or did not sustain

And it shows that, although defendant testified that Hines managed to bind Donna single-handedly, his testimony was not credible. In defendant's telling, Hines and Donna were laughing while Hines bound her and, although Hines asked for his assistance, he instead went to look at the roadster.

But as the trial court found, defendant's claim that Donna laughingly participated in being bound is not at all believable. The record, significantly, shows that Donna appeared scared when Hines and defendant were in her home the day of the murders. After the two arrived, Donna called a friend and sounded a little scared. But the call quickly ended after, according to the friend, a man told Donna to "hurry up and get off the phone." The record further shows that Katherine, after learning of Hines's criminal record, had told him not to come around her home. Considering the circumstances of Donna's binding, defendant's unbelievable explanation for how Hines managed to single-handedly perform the binding, and defendant's active role in assisting Hines after the murders (which we will cover in detail next), the trial court reasonably could have concluded that defendant assisted Hines in binding Donna. (See *People v. Thomas, supra*, 2 Cal.4th at p. 515 [jury could infer the defendant was trying to conceal his guilt when he gave an "apparently false reason" for his actions and provided inconsistent descriptions of his activities].)

Third, as alluded to above, the evidence shows defendant continued to act as a major participant in the crime after lethal force was used. Although defendant claims he attempted to flee after Hines shot Donna, the trial court reasonably could have doubted this self-serving statement—a statement that does not align with defendant's conduct after the murders. Defendant, for example, did not flee the scene and attempt to distance

---

defensive wounds." We disagree. The pathologist described the wounds he found and, as defendant concedes, he did not describe defensive wounds. That is evidence of an absence of defensive wounds. (See *People v. Lewis, supra*, 46 Cal.4th at p. 1283 [absence of injuries in photographs was evidence of an absence of injuries].)

himself from Hines following the murders of Donna and Katherine. He instead, the evidence shows, remained on site, afterward joined defendant in the roadster in a ride around town, and then participated in efforts to conceal the roadster and sell the Robertses' guns. According to an expert witness on handwriting, for instance, following the murders, defendant prepared a document that described some of the guns acquired from the Robertses' home and, beside each gun, listed an apparent sale price. According to an expert on fingerprinting, moreover, defendant's fingerprints appeared on the gun list and on the license plates that had been removed from the roadster—tending to show that defendant sought to conceal the unlawful taking of the roadster. And according to several witnesses who saw Hines and defendant cruising around town in the roadster following the murders, defendant appeared to be "having a good time," "was waving real happy" to those he passed, and exclaimed to one person, "Look at what we got." This evidence of defendant's conduct after the use of lethal force strongly depicts him as a willing participant in the criminal enterprise, not simply a passive bystander.

Considering these circumstances together, we find substantial evidence supports the finding that defendant was a major participant in the crime that led to the deaths of Donna and Katherine. And we find that true even though, as defendant points out, he was only 16 at the time of the crime. Defendant, rightly so, considers this an important detail. As the Supreme Court has found, "[c]hildren 'generally are less mature and responsible than adults[]' [citation]; . . . they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them[]' [citation]; [and] . . . they 'are more vulnerable or susceptible to . . . outside pressures' than adults." (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 272.) These peculiar characteristics of children, as one court has explained, carry relevance in evaluating whether a defendant "was actually aware 'of particular dangers posed by the nature of the crime . . . .' " (*People v. Harris* (2021) 60 Cal.App.5th 939, 960.)

But considering the facts of this case, we find the evidence sufficient to show that defendant, despite his youth, was still aware of the particular dangers posed here. On defendant's own admission, he knew Hines wanted "protection" and "back-up . . . just in case something happen[ed]"—evidencing a potentially dangerous endeavor—and, shortly after entering the Robertses' home, he knew Hines planned to shoot Donna. But despite being explicitly told of these plans to shoot Donna, the evidence tends to show that defendant proceeded to help Hines tie up Donna. And after Hines shot Donna and Katherine, the evidence shows that defendant joined Hines in a celebratory ride in the roadster, took steps to sell the guns taken from the family following the murders, and attempted to conceal the taking of the roadster. On these facts, the trial court reasonably could have concluded that, youth notwithstanding, defendant was a major participant in the crime.[5]

>    2.    Reckless Indifference

We consider next whether defendant acted with reckless indifference to human life.

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the

---

[5] In finding defendant to be a major participant, the trial court further concluded that defendant stabbed Katherine when she returned home and "choked and assisted beating [her] with a blunt instrument." But because we find the evidence discussed above sufficient to conclude that defendant was a major participant without addressing the merits of these findings, we need not address them here.

21

standard of conduct that a law-abiding person would observe in the actor's situation." '
[Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any
[violent felony] is insufficient' to establish reckless indifference to human life; 'only
knowingly creating a "grave risk of death" ' satisfies the statutory requirement."
(*Scoggins, supra*, 9 Cal.5th at p. 677.)

To determine whether defendant had the requisite mental state, "[w]e analyze the
totality of the circumstances" in a manner that largely overlaps with our major participant
discussion. (*Scoggins, supra*, 9 Cal.5th at p. 677.) The overlap is not unusual. As our
Supreme Court has explained, " '[a]lthough we state these two requirements separately,
they often overlap,' " " 'for the greater the defendant's participation in the felony murder,
the more likely that he acted with reckless indifference to human life.' " (*Clark, supra*,
63 Cal.4th at p. 615.) With that in mind, we turn to several considerations our Supreme
Court has found particularly relevant in analyzing whether a defendant acted with
reckless disregard to human life: "Did the defendant use or know that a gun would be
used during the felony? How many weapons were ultimately used? Was the defendant
physically present at the crime? Did he or she have the opportunity to restrain the crime
or aid the victim? What was the duration of the interaction between the perpetrators of
the felony and the victims? What was the defendant's knowledge of his or her
confederate's propensity for violence or likelihood of using lethal force? What efforts
did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*,
at p. 677.)

As with our major participant discussion, we begin with the considerations that
favor defendant. First, as covered already, nothing in the record indicates that defendant
used a gun during the burglary. Second, although the duration of the crime was long, it
does not, under the circumstances of this case, tend to support the conclusion that
defendant exhibited reckless indifference to human life. The record suggests that
defendant and Hines arrived at the Robertses' house around 8:30 a.m. and that Hines shot

22

Donna a little after 10:00 a.m.—a long enough period for Katherine to return home and become a victim herself. But even so, this was not a case where a victim was "held at gunpoint . . . in the presence of perpetrators for prolonged periods"—the traditional circumstance understood to create " 'a greater window of opportunity for violence.' " (*Clark, supra*, 63 Cal.4th at p. 620.) Considering the record, Hines only appears to have revealed his criminal intent to Donna toward the end of his time with her. At the time Donna called her friend, around 10:00 a.m., Donna told her friend that Hines was in her home, and she appeared a little scared. But she never suggested he had a gun on the call, nor is it evident she even appreciated the criminal nature of Hines's and defendant's visit until after the call. Under these circumstances, although the duration of the burglary was substantial, we find the crime's duration does not itself tend to support the conclusion that defendant exhibited reckless indifference to human life. (Cf. *id.* at pp. 620-621 [finding the same when, although the duration of a planned crime was to be substantial and involve "the prolonged detention of [several individuals]," "the period of interaction between perpetrators and victims was designed to be limited"].)

But we find the remaining considerations sufficient to show defendant acted with reckless indifference to human life. First, the record shows that Hines wanted defendant to accompany him to the Robertses' house as "protection" and "back-up . . . just in case something happen[ed]." And, given defendant's shifting explanations for his reasons for joining Hines, it supports the conclusion that defendant understood the criminal nature of Hines's plan. All this evidence, as covered above, tends to show that defendant understood the criminal nature of Hines's plan and knew executing the plan could be dangerous and require "back-up."

Second, we find significant defendant's proximity to the murders and the events leading up to them. Defendant's conduct was, in some sense, comparable to the defendants in *Tison v. Arizona* (1987) 481 U.S. 137—the case that is the source of the "major participant" and "reckless indifference" language that the California Legislature

23

initially added in section 190.2, subdivision (d) and, in time, added to section 189 too. (See *Clark, supra*, 63 Cal.4th at p. 616 ["*Tison* is the source of the language of section 190.2, subdivision (d)" and thus relevant to "the meaning of the statutory phrases derived from it"].) The defendants there, after helping their father and another escape from prison, flagged down a passing car containing a family of four with the intent of stealing their car. (*Tison*, at pp. 139-140.) They afterward guarded the family while their father considered next steps, including the possibility of killing the family, and then watched as their father and the other escaped prisoner, to the defendants' surprise, murdered the family. (*Id.* at pp. 140-141.) Because, the California Supreme Court has said in summarizing *Tison*, the defendants "had ample opportunity to restrain the crime and aid the victims" but "did neither," "the high court [found] they exhibited reckless indifference to human life." (*Scoggins, supra*, 9 Cal.5th at p. 678; see *Tison*, at pp. 157-158.)

Considering the facts here, the trial court reasonably could have concluded the same—that is, that defendant, like the defendants in *Tison*, "had ample opportunity to restrain the crime and aid the victims" but "did neither." (*Scoggins, supra*, 9 Cal.5th at p. 678 [discussing *Tison*].) In defendant's telling, he told Hines to "think" after Hines disclosed that he would bind and then shoot Donna, to put the gun away when Hines first revealed it, not to tie up Donna, and later, to untie her. But the trial court reasonably could have found these self-serving claims not credible. Again, the trial court ultimately concluded that defendant, rather than attempt to restrain Hines as he claimed, actively assisted Hines in binding Donna. As covered above, we find substantial evidence supports this finding.

Third, defendant knew Hines was likely to use lethal force shortly after he entered the Robertses' home. As our Supreme Court has explained, a "defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life" and "may be evident before the felony *or may occur*

*during the felony*." (*Clark, supra*, 63 Cal.4th at p. 621, italics added.) Here, defendant heard Hines say he planned to tie up Donna and then shoot her shortly after they entered the home. He heard Hines tell Donna, after tying her up, "I could shoot you right now." And he afterward told officers, "[A]ll this time, I ke[pt] thinking, 'Wait a minute, you know. He's going to fuckin' probably try to shoot her.' " On defendant's own admission then, he knew early on that Hines was likely to use lethal force.

Fourth, defendant took no meaningful steps to minimize the risk of violence during the burglary. As our Supreme Court has found, "a defendant's apparent efforts to minimize the risk of violence can be relevant to the reckless indifference to human life analysis." (*Clark, supra*, 63 Cal.4th at p. 622.) But here, we find little evidence tending to show that defendant attempted to minimize the risk of violence during the burglary. Defendant, again, claimed he told Hines to "think," to put the gun away when Hines first pulled it out, not to tie up Donna, and then to untie her. But as noted, the trial court reasonably could have found (and in fact, did find) that defendant was not credible and that, rather than attempt to minimize the risk of violence, defendant enhanced the risk of violence when he assisted Hines in binding Donna.

Defendant counters that, in evaluating his failure to minimize the risk of violence, we should consider "the age difference between [him and Hines] and [his] understandable fear of the armed, older man." We agree this type of consideration can be important, though in this case, defendant cites no evidence showing Hines was older.[6] But even assuming he was older, the record here does not persuasively show, as defendant claims,

---

[6] Defendant claims Hines was 24 at the time of the murders but in support cites only defense counsel's argument before the trial court. That, however, is not evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 14 ["unsworn statements of counsel are not evidence"].) As best we can tell, no evidence in the record reveals Hines's age at the time of the murder, though as we previously noted, our Supreme Court has said Hines was 20 at the time. (*Hines, supra*, 15 Cal.4th at p. 1016.)

that he feared Hines. Defendant, for instance, did not attempt to distance himself from Hines after Hines shot Donna and Katherine. He instead joined him in a celebratory ride in the roadster around town. And defendant did not attempt to separate himself from Hines after they parked the roadster. He instead assisted Hines in attempting to conceal the roadster, assisted Hines in attempting to sell the Robertses' guns, and remained with Hines until the time of his arrest the following day. This conduct tends to depict someone who is comfortable around Hines.

Ultimately, considering the totality of the circumstances, we find substantial evidence supports the finding that defendant acted with reckless indifference to human life. To sum up some of the most salient details, the evidence supports the finding that defendant understood the criminal nature of Hines's plan and knew executing the plan could be dangerous. The evidence further supports the finding that defendant knew Hines intended to bind and then shoot Donna shortly after they entered the Robertses' home and, despite knowing this, defendant nonetheless helped Hines bind her. And the evidence shows that following the murders of Donna and Katherine, defendant joined Hines in a celebratory ride in the roadster around town, assisted Hines in attempting to conceal the taking of the roaster, and assisted Hines in taking steps to sell the guns taken from the Robertses' home. We find this evidence together sufficient to show that defendant acted with reckless indifference to human life.

Before ending our discussion on this issue, we return once more to a topic we touched on already—defendant's age at the time of the crime. Defendant raised this topic in the context of discussing the age difference between him and Hines, but we also find it relevant more generally. As other courts have stated, " 'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life.' " (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 987.) But under the facts of this case, we find this consideration offers defendant only limited support here. Although defendant was perhaps more likely to engage in reckless activity because of his youthful

26

age (see *People v. Franklin* (2016) 63 Cal.4th 261, 274), we cannot say his age meaningfully undermined his ability to appreciate the grave risk of death associated with his actions—particularly when Hines expressly told him he planned to shoot Donna. Nor, considering the totality of the circumstances, including defendant's age, can we say that insufficient evidence supported the trial court's finding. In the end, we find defendant's age at the time of the crime carries more relevance on the topic of punishment (see *ibid.*; § 3051) than on the topic of guilt. But that consideration does not assist defendant in his appeal here.[7]

### C.    Probation Report

Lastly, we consider defendant's request that we order several corrections to his probation report.

According to defendant, the probation report includes two inaccuracies. First, it says "defendant was armed in the commission of all these crimes"; and second, it says "defendant was armed with a .22 caliber revolver when these crimes were committed." Defendant characterizes these as "clerical errors" and then, citing *People v. Mitchell* (2001) 26 Cal.4th 181, says courts have inherent authority to correct these types of errors at any time (see *id.* at p. 185 [" 'a court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts' "]). The Attorney General, in turn, contends any asserted errors in the probation report are outside the scope of this appeal.

We agree with the Attorney General. Although courts have broad authority to correct clerical errors at any time—including, for instance, errors in the abstract of

---

[7] Because we find substantial evidence supports the trial court's finding that defendant is guilty of murder under the theory that he was a major participant who acted with reckless indifference to human life, we need not address the trial court's additional ground for finding defendant guilty of murder under the theory that he aided and abetted Hines with the intent to kill.

judgment that fail to reflect the judgment actually rendered (*People v. Mitchell, supra*, 26 Cal.4th at p. 185)—the alleged errors here are not clerical errors. They are instead factual statements that are allegedly not supported by substantial evidence in the record. General error correction of that sort, however, is outside the scope of this appeal. Section 1172.6 grants courts limited jurisdiction to vacate certain murder, attempted murder, and manslaughter convictions, not broad authority to evaluate every factual finding or statement that is allegedly not supported by substantial evidence. Defendant could have sought to correct these alleged factual misstatements in his initial appeal. But he did not. Considering the limited scope of our jurisdiction in this appeal, together with the interest in conserving judicial resources, we will not entertain defendant's request here. (See *People v. Senior* (1995) 33 Cal.App.4th 531, 535 ["California law prohibits a direct attack upon a conviction in a second appeal after a limited remand for resentencing or other posttrial procedures"].)

## DISPOSITION

The judgment is affirmed.


_____/s/_____
EARL, J.


We concur:


\_\_\_\_\_/s/_____
HULL, Acting P. J.


\_\_\_\_\_/s/_____
KRAUSE, J.

28